UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11382-RGS

FRANK WOODWARD

v.

EMULEX CORPORATION and
JEFF HOOGENBOOM

MEMORANDUM AND ORDER ON DEFENDANTS'
AMENDED MOTION FOR SUMMARY JUDGMENT

April 13, 2012

STEARNS, D.J.

This is an unusual employment case.  Plaintiff Frank Woodward's former

employer, defendant Emulex Corporation,[1] admits that it may have made a mistake in

---

[1] According to its website, www.emulex.com/company.html, Emulex is

> the leader in converged networking solutions, provides
> enterprise-class connectivity for servers, networks and
> storage devices within the data center. The Company's
> product portfolio of Fibre Channel host bus adapters,
> network interface cards, converged network adapters,
> controllers, embedded bridges and switches, and
> connectivity management software are proven, tested and
> trusted by the world's largest and most demanding IT
> environments.  Emulex solutions are used and offered by the
> industry's leading server and storage [original equipment
> manufacturers] OEMs including, Cisco, Dell, EMC, Fujitsu,
> Hitachi, Hitachi Data Systems, HP, Huawei, IBM, NEC,
> NetApp and Oracle.  Emulex is headquartered in Costa

terminating one of its most productive salesmen. What is lacking, however, is any evidence that the decision was motivated by discriminatory animus or improper purpose. Because the employment discrimination laws do not authorize federal courts to revise non-discriminatory personnel decisions, however much they may harm affected employees like Woodward, summary judgment will enter for defendants.

## PROCEDURAL BACKGROUND

On June 22, 2010, Woodward commenced this action in the Massachusetts Superior Court against Emulex. Woodward brought claims for "illegal discrimination on account of his age" under Mass. Gen. Laws ch. 151B, §§ 4 and 9 (Count I); "breach of express contract" stemming from Emulex's alleged failure to reimburse him for certain business-related expenses and to give him a full accounting of his 2009 commissions, and "breach of implied contract" based on Emulex's allegedly false assurances of long-term employment (Count II).[2] Woodward also alleges that co-defendant Jeff Hoogenboom, Emulex's senior vice president of sales, tortiously interfered with Woodward's advantageous business relationship with Emulex "by advocating for [his] termination on account of his age." (Count III). Defendants are

_____

Mesa, Calif., and has offices and research facilities in North America, Asia and Europe.

[2] There is no dispute that Woodward was at all times an at-will employee.

California residents and Woodward is a resident of Massachusetts. Defendants

removed the case to federal district court on diversity grounds, 28 U.S.C. § 1332.

After a lengthy, and at times fractious, exchange of discovery, Emulex and

Hoogenboom brought this motion for summary judgment. The court heard oral

argument on March 27, 2012.

FACTUAL BACKGROUND[3]

The facts are taken in the light most favorable to Woodward as the nonmoving

party. *Levy v. FDIC*, 7 F.3d 1054, 1056 (1st Cir. 1993). Emulex hired Woodward as

an account manager in April of 2000. At that time, Woodward signed an

"Acknowledgment of At-Will Employment." Defs.' SOF ¶ 1. The Acknowledgment

read as follows.

> I understand that my employment relationship with Emulex is at-will.
> Accordingly, I have the right to resign from employment for any reason
> at any time, and Emulex has the right to discharge me at any time for any
> reason not prohibited by statute, with or without good cause, and with or
> without prior notice. I understand and agree that the at-will relationship
> will remain in effect throughout my employment with Emulex, and that
> such at-will nature of employment can only be modified by a specific
> written employment contract signed by me and the President/CEO of
> Emulex. This Acknowledgment supersedes any prior discussions or
> agreements regarding the at-will nature of employment, and contains the

---

[3] The following is taken from defendants' Statement of Facts (SOF) (Defs.' SOF)
- Dkt # 46; Woodward's Response SOF (Opp'n SOF) - Dkt # 56; and Defs.' Reply
SOF - Dkt # 71.

full and complete agreement regarding such at-will employment.

*Id.* ¶ 2.  After three years as an account manager, Woodward was promoted to director of sales, and the following year to senior director of sales (his technical title in Emulex's nomenclature was Senior Director OEM Account Manager).[4]  In his role as a senior director, Woodward was responsible for the sale of certain products to EMC, one of Emulex's major clients.[5]  Emulex describes Woodward's duties with respect to the EMC account as follows.  "Woodward was responsible for EMC revenue, had quota responsibility for EMC revenue, had forecasting responsibility for EMC revenue and was responsible for coordinating sales activities for EMC products with other parts of the global sales organization."  Defs.' Reply SOF ¶ 12.  Two junior Emulex employees reported to Woodward and assisted him in servicing the EMC account.

Fred Gill, Emulex's former vice president of sales who recruited Woodward to

---

[4] OEMs are manufacturers who resell another company's product under their own name and branding, offering their own warranty, customer support, and product licensing.  "The term is really a misnomer because OEMs are not the original manufacturers; they are the customers."  www.webopedia.com/TERM/O/OEM.html.  Emulex supplies OEM products to customers like EMC, IBM, HP, and Dell.  *See* Baxter Dep. at 51.

[5] Woodward points out, and Emulex agrees, that there were times during his employment that he "had other account responsibilities and supervised other Emulex employees."  Defs.' Reply SOF ¶ 6.  He notes that "just prior to his termination in April of 2009, [he] had responsibility and quota obligations for EMC and Dell."  Opp'n SOF ¶ 6.

Emulex, testified that he

> proved his worth almost immediately upon being hired, when he was
> assigned to address the issues of a bad product, Product 8000 . . . . He
> demonstrated one of his signal strengths, which was knowing who to
> approach and contact at the executive level of the [EMC] account to help
> keep the customer calm during the search for a solution.

Gill Aff. ¶ 8. Woodward earned a number of "design wins"[6] at EMC and had excellent

relationships with its key executives. *See* Pl.'s Ex. 4 at 13-14. Woodward was

universally admired by clients and co-workers, and over his years at Emulex brought

in substantial revenues. Woodward Aff. ¶ 35 ("EMC was the third or fourth largest

customer for Emulex, and provided more than 10% of the company's revenues."); Gill

Aff. ¶ 10 ("The EMC account Mr. Woodward was responsible for produced some ten

percent or so of Emulex's business, and was one of the three major accounts at Emulex,

along with HP and IBM.").

Trouble manifested itself in the first quarter of 2007, when Emulex's sales to

EMC, particularly the sales of "host bus adapters" (HBAs) (a mainstay for

Woodward's sales team), declined.[7] Defs.' Reply SOF ¶ 7. According to Mark

---

[6] A design win occurs when an employee persuades a manufacturing client to
design one of its components into the client's product – assuring a volume of sales for
that component. *See* Gill Aff. ¶ 13. Woodward had over one hundred design wins
during his nine years at Emulex. Woodward Aff. ¶ 15.

[7] An HBA is "an adapter that sits between the host-computer's bus and the Fibre
Channel loop and manages the transfer of information between the two channels. In

Baxter, Emulex's East Coast senior sales director, "Emulex makes products for blade servers and stand-alone servers that tie into storage. The shift in the industry started bringing a lot more blade servers into the OEM market."[8]  Baxter Dep. at 50.  As a consequence, Emulex placed "a lot of [its] focus . . . on that piece of the business." *Id*. However, EMC chose not to sell blade servers.

Woodward faults Emulex's decision as a mistaken business strategy and maintains that from the perspective of his thirty years of experience in the industry the "sales of HBAs for storage and servers remained strong during 2008 and 2009, and are still strong today."  Woodward Aff. ¶ 52.  Woodward contends that Emulex made several other errors in business judgment that negatively impacted the EMC account.[9] Among these, Woodward cites Emulex's decision to exit product lines (AD1500 and AD2500) that had been designed into applications at EMC ("Invista" and "Recoverpoint").  Pl.'s Ex. 4 at 4 (Woodward Performance Review).  He also faults

_____

order to minimize the impact on the host processor performance, the HBA performs many low-level interface functions automatically or with minimal processor involvement."  www.webopedia.com/TERM/O/HBA.html.

[8] Baxter explained that blade servers are smaller than a traditional server so "preferable" in terms of "cooling and power."  Baxter Dep. at 57 (Defs.' Ex. 15).

[9] Woodward had no say in the final decision-making concerning future product development for EMC – "product roadmaps."  Defs.' Reply SOF 6; Woodward Aff. ¶ 30.

Emulex's chronic inability to timely deliver EMC product, its reduction of field support to his EMC sales team, and its practice of shipping product inventory to distributors prior to sale ("preshipping"), which often led to revenue losses on the account. Woodward Aff. ¶¶ 29, 37, 60-61. Finally, Woodward claims that Emulex began to transition responsibility for some EMC sales to other OEM sales managers, appropriating EMC revenues for which he otherwise would have been credited.

Early in 2009, Emulex hired Jeff Hoogenboom as its senior vice president of sales. At their first sales meeting, Hoogenboom informed Woodward that he was expected to "re-energize his [EMC] team." Woodward Dep. at 194. Woodward later came to believe that Hoogenboom's statement possibly was a coded reference to the age of his team – known to be Emulex's "oldest sales team." *Id*. at 194-195. By March of 2009, Emulex eliminated the positions of Woodward's two assistants, and told Woodward that he would be let go at the end of the fiscal year because of EMC's falling sales revenues.[10] Defs.' SOF ¶ 14; Woodward Aff. ¶ 39. Woodward's last day

---

[10] Woodward offers evidence that Emulex found new positions for other sales executives despite their declining sales numbers or lost accounts. Woodward Aff. ¶ 43; Gill Aff. ¶¶ 21-22. He also maintains that other Emulex sales account teams experienced revenue declines without the account manager being terminated, but received additional assistance instead – notably the IBM account team. Opp'n SOF ¶ 9.

at Emulex was July 3, 2009 – he was fifty-five years old.[11]   Woodward's

responsibilities were assumed by two other Emulex employees – Mark Funari (fifty-one

years old) and Bryan Cowger (forty-five years old).  The EMC account was serviced

by Funari and by Gary Archer, a senior systems engineer (fifty-seven years old).  Defs.'

SOF ¶ 15; Woodward Dep. 173-177; Defs.' Ex. H.

During his employment at Emulex, Woodward was approached by "over a dozen

[other] companies" that offered him sales positions.  Woodward Aff.  ¶ 25.  Emulex's

sales manager, Fred Gill, urged Woodward "to remain with Emulex, and assured him

[that] his job was secure and his prospects for a future with the company were

bright."[12]  Gill Aff. ¶ 26.  Gill mentioned "that Emulex was likely to acquire additional

companies, and that these acquisitions raised the likelihood that Woodward would be

able to fit into a new, higher level sales leadership position as a result."  *Id*. ¶ 27.

As part of his compensation, Woodward received a "monthly auto allowance of

$550," and until December of 2008, was allowed to claim reimbursement for work-

---

[11] Woodward claims "that a disproportionate number of older workers were terminated by or otherwise compelled to leave [Emulex] at or around the time [he] was chosen for termination.  Among those were: Fred Gill (52) EVP Sales; Mike Smith (53) EVP Marketing; Kevin Eldracher (53); George Iavicoli (49); Steve Marconi (42); David Diamond (42); Alan Wollman (64); and Adam Ackley (52)."  Woodward Aff. ¶ 41.  Woodward claims that despite the terminations, Emulex continued to hire sales personnel.  *See* Pl.'s Ex. 20.

[12] Emulex terminated Gill prior to Woodward's firing.

related mileage. Defs.' SOF ¶¶ 20-21. As a cost-cutting measure, Emulex revised the policy, cancelling mileage reimbursement for employees who received the monthly auto allowance. *Id.* ¶ 22. *See also* Rockenbach Aff. ¶¶ 4-8 (Defs.' Ex. G). However, Woodward complains that Emulex owes him some $4,558.40 in mileage costs incurred in 2009. Emulex counters that Woodward did not submit any mileage charges for the period from January 1 to July 3, 2009, confirming his knowledge of the change in policy, and only raised this claim post-termination. *Id.* ¶ 8. Woodward counters that he only later learned that "[o]ther sales force employees [received] reimbursement for mileage related expenses after January 2009." Opp'n SOF ¶ 22.

Woodward states that he did file an expense report including mileage-related expenses incurred in 2009, but was told to resubmit it without the mileage reimbursement request. *Id.* ¶ 23.

On August 5, 2009, Woodward filed an age discrimination complaint against Emulex with the Massachusetts Commission Against Discrimination (MCAD).[13] The MCAD dismissed Woodward's complaint on May 14, 2010, finding that Emulex had

---

[13] It is undisputed that during his employment at Emulex, Woodward did not complain about age discrimination to the Human Resources department or any of his superiors. Woodward states only that he "mentioned to co-workers and family members that management appeared to be conscious of and remarking on his age and that of other members of the EMC sales team." Opp'n SOF ¶ 17.

instituted a legitimate reduction in force and that Woodward had failed to raise "a reasonable inference" that an age animus motivated his termination. Woodward then filed this action on June 22, 2010.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). In an employment discrimination case, the plaintiff "cannot rely exclusively on bald assertions, unsupported conclusions, or optimistic surmises. . . . Where, as here, the nonmovant-plaintiff has the burden of proof, the evidence adduced on each of the elements of his asserted cause of action must be significantly probative in order to forestall summary judgment." *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007). "[C]onjecture cannot take the place of proof in the summary judgment calculus." *Id.* at 31. Rule 56 "mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In analyzing Mass. Gen. Laws ch. 151B employment discrimination cases, Massachusetts courts apply the federally-mandated *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973); *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 420 (2003). *See also Wheelock Coll. v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 134-137 (1976). Woodward is unable, despite his best efforts, to offer credible direct evidence of age discrimination.[14] Because his job was eliminated along with those of several other

---

[14] Woodward states that he heard (or heard about) "executives comment[ing] on the age of our team." Woodward Aff. ¶ 42. Depending on its context, there is nothing inherently discriminatory in such comments (assuming that they, in fact, were made). More to the issue at hand, Woodward offers no specifics as to who made the remarks, to whom they were made, when they were made, and whether the speaker to whom the remark or remarks are attributed had any role in selecting the employees who would be impacted by the reduction in force. Woodward also implies age animus in Hoogenboom's remark that Woodward needed to "re-energize his team," an insinuation that the court does not share even when viewing the remark through the plaintiff-friendly lens of summary judgment, as the remark can as easily be interpreted as suggesting the team might need the injection of a more senior manager with broader account experience). Assuming the worst, however, the law is clear that the single, stray remark of a newly-hired sales chief to the manager of one of his underperforming accounts will not carry Woodward's burden. *See Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 50 n.24 (2005) (finding statements that "you are part of the old guard. You have never adapted to the new system at Liberty Mutual. You simply do not fit in around here anymore" insufficient to support an age discrimination charge); *Lee v. President & Fellows of Harvard Coll.*, 60 Mass. App. Ct. 836, 840-841 (2004) (remark that "younger is cheaper" did not support a finding of age animus). *See also Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (holding that employer's statements that employee had a "low energy level" and was "resistant to change" did not raise an inference of age discrimination); *Nesbit v. Pepsico, Inc.*, 994

11

members of the EMC sales team, the court (as did the MCAD) will apply a Chapter 151B reduction-in-force analysis. As an initial matter, Woodward must show that: (1) he was a member of a protected class (over forty years old); (2) that he performed his job satisfactorily; (3) that he was terminated; and (4) that his termination "occurred in circumstances that would raise a reasonable inference of unlawful discrimination." *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 45 (2005).[15] "The purpose of the prima facie case is to identify those circumstances where the employer's actions, 'if left unexplained, are more likely than not based on unlawful discrimination." *Id.* at 43, quoting *Lewis v. Boston*, 321 F.3d 207, 216 (1st Cir. 2003).

If Woodward succeeds in this, "[t]he burden then shifts to the defendant to

---

F.2d 703, 705 (9th Cir. 1993) (affirming summary judgment in an age discrimination case despite evidence of comments by supervisors such as "we don't necessarily like gray hair" and "we don't want unpromotable fifty-year olds around"); *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992) (holding that statement referencing "young blood" was not probative of age discrimination or a discriminatory purpose); *Gagne v. Nw. Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (holding that a supervisor's statement that he "needed younger blood" was insufficient to create a genuine issue of material fact regarding age discrimination), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-102 (2003).

[15] Because in a reduction in force case, a plaintiff is not replaced, the fourth element of a disparate treatment prima facie case is "nonsensical." *Id.* at 41. Rather the fourth element is satisfied when a plaintiff produces some evidence that "[his] layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination," as, for example, where younger or unprotected workers are retained in the same position or where the younger or unprotected worker who is retained in a comparable position has received less favorable evaluations. *Id.* at 45-46.

present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision." *Quiñones v. Buick*, 436 F.3d 284, 289 (1st Cir. 2006). If the defendant provides such a reason, the burden then shifts back to Woodward requiring that he prove, by a preponderance of the evidence, that Emulex's alleged nondiscriminatory reason for his termination was in fact a pretext for discrimination. *See Quiñones*, 436 F.3d at 289. In applying this framework, the court is sensitive to the First Circuit's *verbum sapienti* that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent."[16] *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000), citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998). *See also DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (trial courts "should use restraint in granting summary judgment where discriminatory animus is in issue").

---

[16] *See also Brunner v. Stone & Webster Eng'g Corp.*, 413 Mass. 698, 705 (1992), quoting *Flesner v. Tech Commc'n. Corp.*, 410 Mass. 805, 809 (1991) ("[W]here motive, intent or state of mind questions are at issue, summary judgment is often inappropriate because of the often dense factual context."). A defendant's motion for summary judgment, however, will be granted where the plaintiff's evidence of intent, motive, or state of mind is wanting. *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440 (1995).

There is little reason to linger over the first three prongs of the prima facie test as Woodward satisfies them easily (and Emulex does not argue otherwise).[17] The issue is whether the circumstances of Woodward's termination raise a reasonable inference of discrimination at the fourth step of the analysis. In support of the fourth prong, Woodward states only that his "job was taken over by someone more than five years younger than he, specifically, Tony Funari, born 1958 and Bryan Cowger, born 1963." Woodward suggests that under *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 n.11 (1st Cir. 1979), and *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 (1st Cir. 2009), he need show no more.[18] *See* Opp'n Mem. at 7. However, in *Sullivan*, the SJC specifically rejected an "age disparity of five years or more between a discharged plaintiff and a younger replacement [as] satisf[ying the] fourth element in a [Chapter

---

[17] With respect to the second prong of the test, Emulex notes in passing that the income on Woodward's portion of the EMC account (HBA revenues) steadily declined (from $23.3 million in the fourth quarter of fiscal 2007, to about $11.2 million in the first quarter of fiscal year 2009), but it does not blame Woodward for the fall-off in revenues. Defs.' SOF ¶ 11.

[18] In *Vélez*, the court held that, in the context of an ADEA claim, the fourth prong of the *McDonnell Douglas* framework requires a showing that "the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services." *Id*. The evidence shows that Woodward's position as Senior Director Account Management was not filled, rather his responsibilities on the account were assigned to the remaining sales person on the EMC team – Funari, while some oversight responsibilities were transferred to Cowger, an Emulex vice president. Defs.' Reply SOF ¶ 14.

151B] age discrimination case." *Sullivan*, 444 Mass. at 42. "The mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case." *Id.* at 44.

I will assume, for sake of completeness, that Emulex's retention of Funari and Cowger and the assignment to them of Woodward's former duties despite any significant differences in the age of three men might be found sufficient to surmount the fourth prong of the reduction-in-force test. Where a prima facie case is successfully made, the employer has the responsibility to come forward with "a lawful reason for its decision and [to] produce supporting facts indicating that this reason was actually a motive in the decision." *Trs. of Forbes Library v. Labor Relations Comm.*, 384 Mass. 559, 566 (1981). "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext." *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996).

According to Emulex, in the face of the continued decline in revenues from the EMC account, it decided to reorganize the sales team by laying off the two junior members and eliminating the position that Woodward held, that of Senior Director OEM Account Manager. The forty-five year-old Cowger "added [Woodward's functions] to his existing duties," Defs.' Reply SOF ¶ 14, leaving only two employees on the EMC team itself – Funari, who was fifty-one years old, and Gary Archer, a senior systems

engineer, who was fifty-seven. This explanation, which is not tested for credibility, but only plausibility, easily satisfies Emulex's second-stage burden. *See Scott v. Boston Hous. Auth.*, 56 Mass. App. Ct. 287, 292-293 n.7 (2002).

At the third stage, "the presumption created by the prima facie case drops from the case" and "the employee must show that the basis of the employer's decision was unlawful discrimination," *see Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 117 (2000); in other words, that the termination was "'because of' the discrimination."[19] *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 505 (2001). In attempting to marshal evidence of pretext, Woodward acknowledges that the EMC revenues were falling in part because of a "downturn in the information technology industry." Woodward Aff. ¶ 33. However, he attributes the bulk of the decline to Emulex's

---

[19] The Massachusetts Supreme Judicial Court has defined the causation requirement as follows.

> Our decisions have described the causal element in various ways, which essentially have been the proximate or determinative cause standard used in negligence cases. . . . [T]he plaintiff must prove by a preponderance of the credible evidence that the defendant's discriminatory animus contributed significantly to that action, that it was a material and important ingredient in causing it to happen. That a defendant's discriminatory intent, motive or state of mind is "the determinative cause" does not imply the discriminatory animus was the only cause of that action.

*Lipchitz*, 434 Mass. at 506 n.19.

business strategies – particularly "to de-emphasize focusing on EMC and . . . to focus sales efforts on the Server OEMs (HP, IBM, Sun) . . . at the expense of EMC," over which Woodward had little say. Woodward Aff. ¶¶ 29-34, 37. Woodward argues that on the positive side, the sale of "'bridges' still produced some $4-5M; and ASICS producing some $500,000 in quarterly revenues." *Id.* ¶ 45. Emulex, in response, points out that these product sales did not fall within Woodward's area of responsibility, and that the decline in the EMC account from 2007 until mid-2009 was solely attributable to declining sales of the products to EMC, for which Woodward had responsibility. Defs.' Reply SOF ¶¶ 11, 14.

As a general matter, the court agrees with Emulex that it had no responsibility to divert the sales of all products to EMC through Woodward in order to bolster his account team's numbers. Nor was it required to adopt any of the various "better" business strategies that Woodward recommends in his affidavit (from improving "shipping practices" to reforming "practices of the Field Sales Team" to more aggressively seeking out "potential growth opportunities"). Woodward Aff. ¶¶ 47-48, 59-61, 64. Woodward, however, contends that Emulex has retained other sales managers despite declining sales numbers. He cites the case of Walter Moore, the director of Emulex's Hewlett Packard account, as his prime example.

After Mr. Moore had been on the account for a few years, the revenues

from the account had slipped significantly. In response, Emulex retained Mr. Moore on the account, but hired a new employee, Jim Welsh, and named him director on the account. Mr. Moore to the best of my knowledge retained his title and his salary. He is still employed by Emulex today.

Woodward Aff. ¶ 58. Woodward also points out that "Emulex hired a sales executive David Cloward *in 2001*, on an account that produced less than $5 million dollars per year in revenue." Woodward Aff. ¶ 65 (emphasis supplied). While Woodward's suggestion is one of disparate treatment, too little is offered by way of fact to assess the comparability of these two examples with each other or with Woodward himself.[20] *See Blare*, 419 Mass. at 441, citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (to prove disparate treatment a plaintiff must show that he was treated less favorably with respect to *similarly situated* co-workers who were not members of his protected class). No information is presented regarding the costs of supporting Moore's or Cloward's sales teams, any special added talents these men brought to Emulex, the number of employees they supervised, the types of products they sold, their compensation structures, and so forth. There is simply no basis for any meaningful

_____

[20] In the opposition memorandum, Woodward mentions that "Senior Director Wong (age 45) and Director Bagaine (age 51) were also moved between accounts but were retained." Opp'n Mem. at 22. However, no evidence is offered to support this conclusory statement.

comparison.[21]

As the debate illustrates, at bottom this is not a dispute about some artfully concealed discriminatory animus, but rather a disagreement over the soundness of the way Emulex chose to run its business. There is no difference in the federal and state tests in this regard. "There is little doubt that an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating [federal] Title VII even though those positions are held by members of protected groups. . . . [A]n employer can hire or fire one employee instead of another for any reason, fair or unfair, provided that the employer's choice is not driven by . . . some . . . protected characteristic." *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 422 (1st Cir. 1996). Moreover, "a position elimination defense is not defeated merely because another employee, already on the payroll, is designated to carry out some or all of the

---

[21] In the SOF, Woodward's counsel offers a list of nine Emulex employees who he claims are all "senior directors" or "directors" who "had revenue goals lower than Woodward, were younger than Woodward, and were not terminated at the same time as Woodward." Opp'n SOF ¶ 4. This cursory chart lacks even superficial value – suffering from the same infirmities as the attempt to use Moore and Cloward as exemplars. All but two of the listed directors are over forty years old, and are thus in the same protected class as Woodward. Emulex points out that it has retained five employees in senior director positions who are older than Woodward. Defs.' Reply SOF ¶ 4. As noted in the MCAD's decision, "[a]s of March 30, 2009, the average and median ages of [Emulex's] U.S. based employees was approximately 45." Defs.' Ex. H.

fired employee's duties in addition to his own, or because those duties are otherwise reallocated within the existing work force." *Id.* at 423. A court does not sit as a "super personnel department []" second-guessing "the merits – or even the rationality – of employers' nondiscriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). *See also Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) (proof of competing qualifications will seldom, if ever, create a liable issue of pretext). Under the "business judgment" rule, "an employer is free to terminate an employee for any nondiscriminatory reason, even if its business judgment seems objectively unwise." *Webber v. Int'l Paper Co.*, 417 F.3d 229, 238 (1st Cir. 2005), citing *Fennell v. First Step Design, Ltd.*, 83 F.3d 526, 537 (1st Cir. 1996).

In one aspect, Massachusetts case law arguably differs from that of its federal analog. If Woodward can show that any of Emulex's stated reasons for his termination were "deliberately false," the misrepresentation could "rationally support a jury verdict" in his favor. *Joyal v. Hasbro, Inc.*, 380 F.3d 14, 17 (1st Cir. 2004), citing *Lipchitz,* 434 Mass. at 498 (a plaintiff may be able – automatically and regardless of circumstances – to avoid a directed verdict and reach a jury if he or she proves that at least one of the reasons given by the defendant was pretextual). Woodward, however, provides no probative evidence of pretext. It is undisputed that the revenues on the EMC account dropped steadily from 2007 through Woodward's termination in mid-2009. Nor do the

parties disagree that in 2009, Emulex laid off several other employees assigned to the EMC sales team. Finally, Woodward has not shown that he was treated in a manner significantly disparate from any of his similarly situated peers *because of his age*. In sum, the claim for age discrimination cannot survive summary disposition.

**Breach of Express Contract**

Woodward executed an Acknowledgment of At-Will Employment when he was hired by Emulex in April of 2000. It explicitly stated that his employment was terminable at will. Under Massachusetts law, an at-will employee may be terminated at any time and for any reason (or for no reason at all) and without prior warning. *See, e.g., Kolodziej v. Smith*, 412 Mass. 215, 221-222 (1992); *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 9 (1988); *Mullen v. Ludlow Hosp. Soc'y*, 32 Mass. App. Ct. 968, 969 (1992). There are only two exceptions: (1) when an employee is "terminated contrary to well-defined public policy"; or (2) is terminated in bad faith as a means of depriving him of earned wages, bonuses, or commissions (in violation of the implied covenant of good faith and fair dealing). *See Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 472 (1992); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 672 (1981). Neither of these exceptions apply.

Woodward bases his express contract claim on the contention that Emulex "expressly agreed to reimburse [him] for business-related expenses that he covered out

21

of his own funds during the course of his work on [its] behalf." Compl. ¶ 39. Woodward also complains that Emulex has refused to give him a complete accounting of his earned commissions ("despite repeated requests") and that it owes him $4,558.40 in mileage expenses. Emulex, however, offers unrebutted evidence that it accounted for and paid Woodward for all of his earned commissions and reimbursed him for all of the expenses to which he was entitled under Emulex's Travel Policy.[22] Emulex has attached to its summary judgment motion emails that were sent to Woodward (and all other affected employees) explaining the change in mileage reimbursement policy. Under Emulex's new policy, account team employees who received a monthly auto allowance could no longer claim mileage reimbursement for travel to and from their customers' facilities, including those owned and/or operated by EMC. *See* Rockenbach Aff. ¶ 5 and Ex. G. Woodward admits that he received the December 2008 email detailing the change in policy. Opp'n SOF ¶ 21. However, he claims he is owed additional mileage for 2009, because "[o]ther sales teams began resubmitting their mileage from January 2009-June 2009." *See* Woodward Aff. ¶ 68. This is only an unsupported assertion, not evidence sufficient to withstand summary judgment.

---

[22] Emulex attaches as Exhibit 4 "the full accounting details and calculations of quarterly commissions" for fiscal years 2005 - 2009, to the sworn Affidavit of Michael Rockenbach submitted in support of summary judgment.

**Breach of Implied Contract**

Woodward claims that Emulex unfairly induced him to remain in its employ and forego other opportunities, thus creating an implied contract of employment, which it then breached by the termination. A contract implied in fact comes into being when, notwithstanding the absence of a written or verbal agreement, the conduct or relations of the parties imply the existence of a contract. *Popponesset Beach Ass'n v. Marchillo*, 39 Mass. App. Ct. 586, 592 (1996). There are no facts here, however, that support the creation of such a contract.

First, Woodward knew from the very beginning of his employment, by signing the Acknowledgment, that he was an at-will employee and that "Emulex ha[d] the right to discharge [him] at any time for any reason not prohibited by statute." Defs' SOF ¶ 1. Woodward bases his claim to the contrary on the fact that Gill (who was then his supervisor) "urged [him] to remain with Emulex, assur[ing] him his job was secure and his prospects for a future with the company were bright. . . . [S]pecifically [Gill] mentioned to him that Emulex was likely to acquire additional companies and that these acquisitions raised the likelihood that [he] would be able to fit into a new, higher level sales leadership position as a result." Gill Aff. ¶¶ 26-27. Gill told Woodward that "if John Aliferia moved ahead in the company, Woodward would have been a logical candidate to move into his position." *Id.* ¶ 28. Even assuming that Gill had the

authority to override the express terms of Woodward's at-will agreement and offer him permanent employment with Emulex (which is unlikely), his statements are devoid of any specific promise, and at best offer only rosy scenarios contingent on future events. Any business person (like Woodward) would have understood Gill's statements to amount to no more than an "atta boy" for his good work and a personal hope that he would remain with the company as it grew and prospered.

Woodward's sole suggestion to the contrary is a citation to *McAndrew v. Sch. Comm. of Cambridge*, 20 Mass. App. Ct. 356 (1985). McAndrew, a music teacher, was offered a one-year permanent position as a band leader and orchestra teacher at Cambridge High and Latin School for the 1980-1981 school year. A Georgia resident, McAndrew had responded to a newspaper advertisement while visiting relatives in Boston. Eager to fill the position quickly (the former band leader had resigned suddenly, the beginning of the school year was at hand, and the band was committed to a number of musical events in the early fall, including a parade in celebration of Cambridge's 350th anniversary), the director and assistant director of music interviewed McAndrew, and after his references proved positive, offered him the position. Although McAndrew was told that the offer was contingent on the school committee's approval, he was assured that "would be no more than a 'rubber stamp . . . .'" *Id*. at 358. McAndrew accepted the position, gave up his teaching post in Georgia, moved to

Cambridge (at a personal cost of $3,000), and began teaching on September 15, 1980. Three and one-half weeks later, after the 350th anniversary parade, the music directors fired him – stating only that his performance was "unsatisfactory." *Id.* at 358 n.3. They never submitted his name to the superintendent of schools or to the school committee for approval. A jury subsequently found breach of an employment contract and awarded McAndrew $23,000.

The Appeals Court reversed, finding that McAndrew did not have an enforceable employment contract as the "'[a]uthority to employ him was vested solely in the school committee.'" *Id.* at 359, quoting *Demers v. Sch. Comm. of Worcester*, 329 Mass. 370, 373 (1952). The Court found, however, that, under section 90(1) of the Restatement (Second) of Contracts (1981),[23] unless the directors "in good faith ha[d] a valid reason for refraining from doing so," they had promised McAndrew to submit his name to the school committee. *McAndrew*, 20 Mass. App. Ct. at 362. The Court "remanded for further proceedings limited to the issue whether the directors had 'good cause' to refrain from submitting the plaintiff's name; if the answer be no, there will be the further issue

_____

[23] That section provides: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

of damages." *Id.* at 365. Unlike McAndrew, Woodward could have had no reasonable expectation that Gill's positive and encouraging remarks (even given his knowledge that Woodward was receiving other job offers) constituted an unqualified offer of permanent employment at Emulex.

### Tortious Interference with Advantageous Business Relationships

Woodward claims that

> because of his role as Woodward's senior supervisor, defendant Hoogenboom was aware of the advantageous business relationship between Woodward and Emulex [and] [b]y failing to advocate for Emulex to retain Woodward, and by . . . advocating for Woodward's termination, on account of his age and without non-discriminatory reasons, defendant Hoogenboom maliciously and tortiously interfered with Woodward's advantageous business relationship with Emulex.

Compl. ¶¶ 48-49. Hoogenboom contends that because Woodward "is relying on [unprovable] allegations of age discrimination to support his claim of malice" – this claim must be dismissed. Defs.' Mem. at 14.

To survive a motion for summary judgment on a tortious interference claim, Woodward must make out a genuine issue of material fact with respect to each of the following elements: (i) the existence of a business relationship with a third party, (ii) of which the defendant is aware, and (iii) with which he intentionally and improperly interferes, (iv) causing an impairment of the business relationship, (v) to the plaintiff's detriment. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir.

26

2001) (applying Massachusetts law). In this context, actual malice must be shown to prove improper motive or means. *Blackstone v. Cashman*, 448 Mass. 255, 260-261 (2007); *Bray v. Cmty. Newspaper Co.*, 67 Mass. App. Ct. 42, 48 (2006). To establish malice, Woodward "must show more than garden-variety hostility or personal incompatibility." *See Bennett*, 507 F.3d at 33, citing *Zimmerman*, 262 F.3d at 76. *See also King v. Driscoll*, 418 Mass. 576, 587 (1994). Malice further must have been more than a mere concomitant of the parties' relationship; it must have been the "controlling factor" in the offending conduct. *Zimmerman*, 262 F.3d at 76. In other words, "something more than intentional interference is required" to make out the tort. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815 (1990). *See also King*, 418 Mass. at 587 (where a corporate official is named as a defendant, the tort requires "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest"; motivations of personal gain or dislike are not enough); *Blackstone*, 448 Mass. at 261 (corporate officials are held to a standard of actual malice, as their freedom of action with respect to corporate interests should not be restrained by a fear of personal liability).

While Woodward alleges in his Complaint that Hoogenboom advocated for his termination because of his age, he offers no evidence that this is true. The only "evidence" attributed to Hoogenboom in the record is his statement that Woodward

needed to "reenergize his [EMC] team." Woodward Dep. at 194. As earlier explained, this statement will not support a prima facie case of age discrimination, much less the very high showing that proof of malice requires. *See Blackstone*, 448 Mass. at 261 n.10 (the actual malice standard is a heightened burden placed on plaintiff and not a defense to be proved by the defendant).

ORDER

For the foregoing reasons, defendants' motion for summary judgment is <u>ALLOWED</u>. The clerk will enter judgment for defendants on all claims and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE